**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No. 23-cr-00349-CNS

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.  DAVIN DANIEL MEYER,
     a/k/a "Abdul Rahman ibn Meyer,"
     a/k/a "Abdul Rahman al-Amriki,"

      Defendant.

---

**GOVERNMENT'S EMERGENCY MOTION FOR A STAY AND
REVOCATION OF RELEASE ORDER[1]**

---

At a hearing on Wednesday, October 29, 2025, Magistrate Judge Neureiter granted Defendant Davin Daniel Meyer's Second Motion to Amend Conditions of Release, ECF No. 149, and made clear that, at a hearing on Wednesday, November 5, 2025, he will grant the defendant's request for release to live at his mother's house. *See* ECF No. 151. The government files this emergency motion for a stay and to revoke that release order because the release conditions do not assure the safety of the community or the defendant's appearance.[2]

---

[1] On November 3, 2025, the Court ordered the government to file a status update regarding its intention to appeal the magistrate judge's decision. *See* ECF No. 154. The government is hereby filing this motion to inform the Court of its request to revoke the anticipated release order.

[2] If granted, the government's motion to stay and revoke the release order would leave the prior release order in place. That order required the defendant to be on home incarceration at an inpatient treatment facility, Raleigh House. *See* ECF No. 143. The government understands that the defendant's insurance will not pay for him to reside at Raleigh House, and that "treatment at other Raleigh House residential locations, or in their after-care program, is not possible" due to a court order entered in *United States v. Humzah Mashkoor*, Case No. 24-cr-0018-RMR (D. Colo.) (Rodriguez, J.), prohibiting contact between the defendant here and the defendant in that case. *See* ECF No. 149, at 4. Defense counsel raised the possibility of placement at another residential

1

## I.    Overview

While awaiting trial in March 2025 for a charge of attempting to provide material support to a designated foreign terrorist organization, the defendant requests to live with the same custodian—his mother—whose life the defendant threatened and who was so concerned about her safety and the safety of others that she reported her son to law enforcement. The defendant lived with his mother when he became dangerously radicalized, leading to his plans to travel to join ISIS. This radicalization included the defendant discussing his radical Islamic ideology and his desire to travel to the Middle East to serve as a fighter for ISIS with FBI Confidential Human Sources ("CHSs"), whom he believed to be ISIS facilitators. Compl. ¶ 9, ECF No. 1. The defendant told these individuals that he wanted to make hijrah, *i.e.*, travel to join the Islamic State of Iraq and Al-Sham ("ISIS").[3]  Around this time, the defendant also sought out extremist videos and content and discussed his intentions to commit violence, evincing escalating behavior. *Id*. ¶¶ 9-17.

In fact, the defendant's conduct had escalated over a lengthy period of time. As relevant here, law enforcement became aware that the defendant had previously followed white supremacist ideology, and then began practicing Islam, possibly as early as October of 2020. *Id*. ¶ 12. The defendant's mother reported to law enforcement that the defendant attended an eight-month-long

---

treatment facility, but the government lacks sufficient information about this facility to form a position on the defendant's placement at that facility. For instance, the government is not aware of whether the facility has capabilities to assure compliance with the defendant's release conditions necessary to assure the safety of the community or the defendant's appearance. Accordingly, although the government would ordinarily file this motion upon issuance of the release order, the government preemptively files this motion to allow for an expedited briefing schedule and to comply with the Court's order for a status update.

[3] The word "hijrah" is the Arabic word for "migration" or "emigration." When used by ISIS supporters, "hijrah" means traveling to join ISIS.  The government incorporates by reference the entirety of the Complaint, *see* ECF No. 1 ("Compl."), including the history of ISIS, its designation as a foreign terrorist organization ("FTO"), and the history of ISIS leaders calling on supporters to make hijrah.

camp between 2021 and 2022 that focused on mental health and behavior treatment, and while there, he became more radical in his beliefs. *Id*.

The defendant's mother reported to law enforcement that the defendant had told her that he wanted to travel to Syria and become a martyr, or if he did not make it to Syria, he wanted to kill people in the United States, including police and military members. *Id*. ¶ 13. The defendant expressed to his mother the belief that the United States military is killing his Muslim people and that he is willing to kill himself and others. *Id*. His mother told law enforcement that she believed that the defendant's behavior was escalating and that she did not feel safe when the defendant discussed violent intentions. *Id*. ¶ 15. The defendant's mother reported previous threats that he had made to kill her but added that he had not been physically violent with her and she did not believe that the defendant would act on his threats. *Id*.

The threats the defendant made to his mother were reiterated by the defendant's grandmother, Carol Meyer, when she was interviewed by law enforcement in the days after his arrest. Carol Meyer reported then that the defendant had threatened his mother, and after one of his treating psychiatrists confirmed to his mother that the defendant was a true threat to her, she then kept something under her bed to defend herself if he tried to attack her. The defendant's grandmother further reported to law enforcement that the family had offered to buy the defendant a one-way ticket to leave so he would no longer pose a threat to his mother, but he had only discussed going somewhere in the Middle East that required a round-trip ticket to avoid suspicion by the government. Carol Meyer told law enforcement that she felt as though the only options left for the defendant were incarceration or suicide.

In October 2022, the defendant's mother informed federal law enforcement that the defendant had stated that if he could not go to the Middle East, he planned to get fertilizer and

build a bomb in the United States. Compl.¶ 16.

The defendant has previously received mental health treatment, including residential treatment programs. *Id*. ¶ 17. During treatment in 2021 and 2022, staff members reported that the defendant had said racist and hateful things to people of color, women, and Jews. *Id*. His mother reported that the defendant refused to take any prescription medication prescribed by the psychiatrist because it would be against his Islamic religion, and he also refused to go to school or participate in online school programs. *Id*.

Ultimately, the defendant obtained a passport and funding for his travel, researched and purchased various items he believed he would need as an ISIS fighter overseas, and planned his hijrah, or travel to join ISIS. *Id*. ¶ 10. On June 23, 2023, the defendant booked a flight, scheduled for July 14, 2023, from Denver via Munich, Germany, to Ankara, Turkey, where he believed he would meet with ISIS members and travel on to Iraq to join ISIS and become an ISIS fighter. *Id*.

The defendant poses a risk to the community (1) if he continues the same pro-ISIS activities he engaged in for years before his arrest; and (2) if he decides to conduct a violent domestic attack. There is serious reason to be concerned about both of these possibilities:  For over a year during his confinement, the defendant repeatedly made statements in recorded jail calls to others that he continued to support ISIS and that he planned to continue his attempts to become a martyr and commit violent acts against the United States if he were to be released.

On more than one occasion, the defendant explained to his mother that he intended to flee to another country upon his release and get his citizenship there in another country. The defendant repeatedly stated his ongoing support for ISIS and the desire to commit the same crime again if released. As an example, in July 2024, the defendant stated in several calls, "I'll kill people for my religion, I should blow myself up in a plane;" that he was trying to travel overseas to die and that

there are still ways to get over there; and his desire to take down the whole U.S. Government. On March 19, 2024, the defendant stated to his mother when discussing possible conditions of release, "I will still use the internet when I get out, I'll be a felon in possession of a firearm." In that call, the defendant confirmed to his mother that he wasn't joking, and she replied that they shouldn't discuss this over the phone—an admonishment she has told him on numerous occasions.

The defendant repeatedly cursed the protective order issued by the Court that limits the disclosure of discovery pertaining to CHS material and repeatedly stated his intent to leak the information to the media upon his release. On April 2, 2024, the defendant said when he gets out, he plans to find the CHS and "pull up on him." The defendant made frequent efforts to access extremist Islamic materials, which the jail staff denied; to contact extremist Islamic leaders; and to make contact with inmates at other facilities. In recorded jail calls, he also discussed his efforts to circumvent the jail facilities restrictions, including getting access to extremist material through a former cellmate who offered to assist him. The defendant also discussed another inmate who, over the course of several months in 2024, the defendant was attempting to convert to radical Islam. The defendant eventually concluded that this other inmate was not taking the Muslim faith seriously and later stated, "I should have slit his throat."

In one call on August 27, 2024, the defendant's mother discussed with him the fact that people get lower sentences when they claim to no longer adhere to extremist ideology anymore. The defendant confirmed to her his views that suicide is justified when it is martyrdom for a cause and his commitment to Islam. The defendant stated, "You know I still support the Islamic State. You know what I'm going to do as soon as I get out. You know what's going to happen." In further discussing the possibility of release on supervision, the defendant said, "As soon as I get out, I'm going to do something, and it won't really mean anything if they try and stop me." The defendant's

mother responded by asking him to "at least pretend" to be deradicalized.  In the days and weeks that followed, the defendant was recorded on phone calls stating that he was questioning his beliefs in Islam, and that he didn't support terrorism. Yet, in an email to his mother on October 27, 2024, he said, "The subject on that one email was just mumbo jumbo, don't worry about it. I was just saying the chaplain saw me so I could get a prayer rug and cap and get on the halal diet. So I still did that stuff despite recent events."

The defendant poses serious potential threats to the community that require strict conditions and neutral third-party custodians who will appropriately monitor—and, if necessary, report—the defendant's activities. The contemplated release conditions that include the defendant residing with his mother on home detention do not satisfy that criteria and, accordingly, fail to reasonably assure the safety of the community and the defendant's appearance.[4]

## II.    Procedural Background

On July 21, 2023, Magistrate Judge Neureiter ordered the defendant detained pending trial, finding that no condition or combination of conditions of release would reasonably assure the safety of any other person and the community or the defendant's appearance. *See* ECF No. 8.[5]

On June 12, 2025, the defendant filed a motion to reopen detention. *See* ECF No. 77. The government opposed the motion. *See* ECF No. 82. The district court referred the matter to

---

[4]   At the hearing on October 29, 2025, the U.S. Probation Office indicated that it could not conduct GPS monitoring of the location of the defendant if the defendant resides on his mother's property due to the insufficient cell phone service at that location. Magistrate Judge Neureiter asked the Probation Office to determine whether GPS monitoring could be accomplished in an alternative manner. The inability of the court to monitor the defendant's location should the defendant be released to the custody of his mother would make it impossible to assure the safety of the community and the defendant's appearance.

[5]   Judge Neureiter assumed without deciding that the instant case does not involve an offense creating a presumption of detention. *See* ECF No. 8, at 1-2. As described below, Section 3142(e)(3)(C)'s presumption of detention applies in this case.

Magistrate Judge Neureiter. *See* ECF No. 79. On June 27, 2025, Judge Neureiter held a hearing on the motion to reopen detention. That same day, over the government's objection, Judge Neureiter found that there was a combination of stringent conditions that would assure the safety of the community and the defendant's appearance—namely, 24-hour-a-day lock-down at Raleigh House while receiving inpatient treatment, GPS monitoring, a prohibition on internet access or access to internet-capable devices, and a requirement that incoming and outgoing mail will be photocopied. *See* ECF No. 87, at 1-2; ECF No. 90, at 2-3.

On September 26, 2025, the defendant requested that he be permitted to transition his residence to the Summit House, a residential treatment facility, with reduced treatment hours and with supervised trips into the community. *See* ECF No. 136. On October 2, 2025, the government filed a response, stating that it did not oppose the defendant's relocation to another residential Raleigh House facility, specifically the Summit House, so long as (1) the defendant remains restricted to the Raleigh House facilities with limited exceptions for medical, court, or treatment purposes, and (2) the defendant is supervised by Raleigh House staff members at all times during transportation and off-site activities. *See* ECF 140, at 1. The government also noted its understanding that the defendant was not requesting that the court allow for his release to a third-party custodian at the time; and that the defendant was not requesting any other changes to his conditions of release, including GPS monitoring and internet-capable device restrictions. *See id*. at 1-2. On October 3, 2025, after a hearing on the matter, Magistrate Judge Neureiter granted the defendant's motion to modify his conditions of release. *See* ECF No. 141; *see also* ECF No. 143, 2-3 (order setting conditions).

On October 14, 2025, the defendant moved for an order directing Pretrial Services to conduct a home evaluation as a potential placement as a condition of continuing pretrial release,

representing that the defendant "will not be able to remain at the current residential facility beyond November 3, 2025." *See* ECF No. 146. Magistrate Judge Neureiter granted the defendant's motion. *See* ECF No. 148.

On October 28, 2025, the defendant moved for release to live with his mother on her property, acknowledging that the continued GPS monitoring of the defendant as required by the court was likely not feasible on the mother's property. *See* ECF No. 149. In the alternative, the defendant requested placement at the Lotus Lodge Sober Living, a residential treatment program for substance abuse addiction. *Id*.

At a hearing on October 29, 2025, the government opposed the defendant's motion. As discussed at the hearing, Magistrate Judge Neureiter intends to grant the defendant's request to be placed with his mother. Magistrate Judge Neureiter set a release hearing for Wednesday, November 5, 2025, to allow time for the Probation Office to determine whether it could continue GPS monitoring of the defendant if he were to reside on his mother's property and to allow the government time to appeal the defendant's release. *See* ECF No. 151, at 2.

The conditions of release will include (1) that the defendant live with his mother, Deanna Meyer; (2) that both his mother, Deanna Meyer, and his grandmother, Carol Meyer, serve as third-party custodians for the defendant; (3) that the defendant attend intensive outpatient treatment at least three times per week; (4) home detention;[6] and (5) no internet access or access to internet-capable devices. *See id.*

---

[6] Magistrate Judge Neureiter asked the probation office to research whether GPS monitoring could be possible with a landline since it is not currently feasible given the limited cell phone service at the home. However, Magistrate Judge Neureiter stated his intention to release the defendant to his mother's home without GPS monitoring if it is not possible with the understanding that his mother would solely monitor and enforce compliance with home detention.

### III.   Legal Framework

Where, as here, a defendant is ordered released by a magistrate judge, this Court may review and revoke the release order. *See* 18 U.S.C. § 3145(a)(1). When the government moves to revoke a release order, the Court (1) may stay the challenged release order prior to making a determination, *see United States v. Ruiz-Corral*, 338 F. Supp. 2d 1195, 1196 (D. Colo. 2004); *cf. United States v. Muhtorov*, 702 F. App'x 694, 698 (10th Cir. 2017); and (2) must conduct a *de novo* review of the magistrate judge's order, *see United States v. Cisneros*, 328 F.3d 610, 616 (10th Cir. 2003). "On *de novo* review of a magistrate judge's order, the district court is charged with making 'an independent determination of the proper pretrial detention or conditions of release.'" *United States v. Garcia*, 445 F. App'x 105, 108–09 (10th Cir. 2011) (quoting *Cisneros*, 328 F.3d at 616 n.1).  The Court may not only "revie[w] the evidence that the magistrate judge based [his] detention decision on[,]" but also "in its discretion . . . any additional proffers on appeal." *United States v. Juarez-Vera*, No. 18-cr-00328-PAB-11, 2018 WL 6444952, at *2 (D. Colo. Dec. 10, 2018).

The government here challenges Magistrate Judge Neureiter's decision to release the defendant to live with his mother on home detention, which, in effect, granted the defendant's motion to amend his prior release conditions. *See* 18 U.S.C. § 3142(c)(3) (providing that "[t]he judicial officer may at any time amend the order [setting conditions of release] to impose additional or different conditions of release").  Thus, the posture is slightly different than the typical § 3145 motion to revoke. Specifically, it is the government's position that the modification—allowing the defendant to live with his mother on home detention—will not "continue to reasonably assure [the defendant's] appearance as required, and reasonably assure the safety of the community." *United States v. Madrigal*, No. 23-cr-266-RM, 2023 WL 5179119, at *2 (D. Colo. Aug. 11, 2023). When

considering a § 3142(c)(3) motion to modify or amend conditions, courts have explained that the "statutory standards applicable to the setting of bail" remain relevant. *United States v. Wang*, 670 F. Supp. 3d 57, 65 (S.D.N.Y. 2023) ("When considering an application to modify a defendant's bail conditions, the Court considers 'the statutory standards applicable to the setting of bail.'" (quoting *United States v. Zuccaro*, 645 F.2d 104, 106 (2d Cir. 1981))).

Under § 3142(g), "in determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community," courts must consider (1) the nature and circumstances of the offense, including whether the offense involves a federal crime of terrorism; (2) the weight of the evidence against the defendant; (3) the defendant's history and characteristics; and (4) the nature and seriousness of the danger the defendant would pose if released. 18 U.S.C. § 3142(g). Those factors are relevant to the ultimate question in detention matters: whether there is a combination of conditions that will reasonably assure the safety of the community and the appearance of the defendant. *See id.* § 3142(f), (g). As relevant here, if the defendant is charged with an offense listed in § 2332b(g)(5)(B) "for which a maximum term of imprisonment of 10 years or more is prescribed," there is a rebuttable presumption that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community." *Id.* § 3142(e)(3)(B). It is the defendant's burden to rebut the presumption. *See United States v. Stricklin*, 932 F.2d 1353, 1355 (10th Cir. 1991). Even if rebutted, "the presumption remains a factor for consideration." *Id.*

Regardless of whether a presumption applies, "the burden of persuasion regarding risk-of-flight and danger to the community always remains with the government." *Id.* at 1354–55. The government must prove risk of flight by a preponderance and dangerousness by clear and

10

convincing evidence. *See Cisneros*, 328 F.3d 610 at 616.

## IV.    Argument

Although the § 3142(g) factors continue to support detention in this case, the question for the Court to consider is not necessarily detention versus release. It is whether the modified release conditions that include the defendant living with his mother will reasonably assure the safety of the community and the defendant's appearance. As detailed below, they do not. If the defendant is to remain released, only the strictest conditions—that include 24/7 supervision by neutral third parties in a third-party facility, incarceration in that third-party facility with GPS monitoring, and a prohibition on internet access—will reasonably assure the safety of the community and the defendant's appearance.

### A.    Section 3142(e)(3)(C)'s presumption of detention applies.

Section 3142 creates a presumption "that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community if the judicial officer finds that there is probable cause to believe that the person committed" specified enumerated offenses, such as an offense listed in 18 U.S.C. § 2332b(g)(5)(B) and which carries a maximum term of imprisonment of 10 years or more. 18 U.S.C. § 3142(e)(3)(B), (C). Ultimately, "the presumption reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial." *United States v. Stone*, 608 F.3d 939, 945 (6th Cir. 2010).

Here, the presumption applies. The grand jury returned an indictment charging the defendant with violating 18 U.S.C. § 2339B. This offense is enumerated in 18 U.S.C. § 2332b(g)(5)(B), and it carries a maximum term of imprisonment of more than ten years. *See* 18 U.S.C. § 3142(e)(3)(C).

### B.    The defendant is charged with a federal crime of terrorism, the nature and

> **circumstances of the offense are aggravated, and the weight of the evidence is strong.**

Section 3142(g) instructs this Court to consider "the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device." 18 U.S.C. § 3142(g)(1). These categories, in Congress's judgment, capture "the most serious of crimes." *United States v. Salerno*, 481 U.S. 739, 747 (1987). The crime charged here constitutes a federal crime of terrorism, which is an "offense that is calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct"; and is a violation of, *inter alia*, 18 U.S.C. § 2339B (relating to providing material support and resources to terrorists). 18 U.S.C. § 2332b(g)(5); *Muhtorov*, 702 F. App'x at 699 (explaining that § 2339B "is a federal crime of terrorism").

Moreover, the nature and circumstances of the offense are aggravated and the weight of the evidence is strong. The government here incorporates the Complaint, *see* ECF No. 1; the government's response to the defendant's motion to reopen detention, *see* ECF No. 82; and the government's response to the defendant's motion to dismiss for extreme and outrageous government conduct, *see* ECF No. 118, at 3-11, all of which include lengthy recitations of the facts. Among other things, the defendant (1) repeatedly pledged allegiance to a leader of ISIS and expressed his desire to a CHS to make hijrah; (2) explained to the CHSs that he was working with Anjem Choudary to make videos to spread messages of support for other extremists around the world;[7] and (3) took significant steps to plan his travel to join ISIS, including obtaining his

---

[7] Choudary had previously been convicted in the UK under section 12 of the Terrorism Act 2000 for inviting support of a proscribed organization, namely the Islamic State, between June 2014 and March 2015. He was released in 2018 and arrested again in July of 2023. He has since been convicted and sentenced to life imprisonment for directing a terror organization.

12

passport, getting a job to attempt to fund his travel, and making the necessary purchases he thought he needed to be prepared to join ISIS upon his arrival.

The nature and circumstances of the offense and the weight of the evidence strongly support detention in this case. *See* 18 U.S.C. § 3142(g)(1), (2); *see also Muhtorov,* 702 F. App'x at 702 (reversing district court release order for defendant charged with violating § 2339B, where, among other things, the defendant "professed that he [was] willing to fight and die for his cause, and he took affirmative steps to further that goal").

**C.      The defendant's history and characteristics further demonstrate the risk he poses on release.**

The defendant's history and characteristics also demonstrate that he poses a risk of flight and danger to the community if released.

The government acknowledges that the defendant is young and does not have any criminal history. The government also acknowledges that the defendant has been diagnosed with autism spectrum disorder. However, there is no basis to conclude that the diagnosis explains or mitigates the aggravated conduct in this case.

Finally, the government acknowledges that the defendant has the support of his mother, who now asserts that she is willing to take custody of the defendant. The defendant was, however, living with his mother at the time of his arrest, and had lived with her at various times during the relevant period while he was planning to join ISIS. She was unable to appropriately supervise him at that time. In light of the threats the defendant was making against her, the Court previously acknowledged, "she is in a difficult position, but I do not believe that we should be placing that burden back on her at this point. It is just an unfair ask." ECF No. 77-1, at 73. This remains true today.

**D.      The defendant would pose a danger to the community if released.**

13

The defendant poses a danger to the community (1) if he continues the same pro-ISIS activities he engaged in for years before his arrest; and (2) if he decides to conduct a violent domestic attack. As described above, even when detained, the defendant made statements evincing support for ISIS and detailing how he would engage in terroristic activities and retaliate against the CHSs. For instance, in July 2024, the defendant stated in several calls, "I'll kill people for my religion, I should blow myself up in a plane;" that he was trying to travel overseas to die and that there are still ways to get over there; and his desire to take down the whole U.S. Government. The defendant made frequent efforts to access extremist Islamic materials, which the jail staff denied; to contact extremist Islamic leaders; and to make contact with inmates at other facilities.

The latter danger is based on the defendant's own statements, as reported by the defendant's mother to law enforcement, that (1) he wanted to travel to Syria and become a martyr, or if he did not make it to Syria, he wanted to kill people in the United States, including police and military members; (2) he believed the U.S. military is killing his Muslim people and that he is willing to kill himself and others; and (3) that if he could not go to the Middle East, he planned to get fertilizer and build a bomb in the United States. Further, in a call from jail on March 19, 2024, the defendant stated to his mother when discussing possible conditions of release, "I will still use the internet when I get out, I'll be a felon in possession of a firearm." And on April 2, 2024, the defendant said when he gets out, he plans to find the CHS and "pull up on him." Based on this case, the defendant has been thwarted in his attempts to travel to join ISIS.

The defendant's self-interested efforts to portray himself as incapable of doing anything for himself should not alter the Court's analysis of the risk he poses. *See* ECF No. 100, at 12-13. The evidence here shows that, when he wanted to, the defendant was fully capable of doing things on his own. To the extent he often relied on others, the evidence shows that when the defendant

14

wanted to do something, he found a way to do so. The defendant developed a deep understanding of extremist Islamic teachings as they applied to the calling to fight (jihad[8]). He took an oath of bayah,[9] expressing loyalty to the ISIS leader, and took a second oath immediately upon the announcement of the new ISIS leader. He contacted and began working with Anjem Choudary, making videos for Choudary to raise awareness for various projects. Additionally, the defendant took the initiative to get a passport, to get a job to attempt to fund his travel, and to make the necessary purchases he thought he needed to be prepared to join ISIS upon his arrival. When his mother offered him money for an apartment, he convinced her to give him several months' rent up front, which he then used to surreptitiously fund his plans in support of ISIS.

The defendant poses a significant risk to the community.

### E. The current release plan will not reasonably assure the safety of the community or the defendant's appearance.

In light of the § 3142(g) factors and the risks outlined above, if the defendant remains released, he should be subject to the strictest conditions. The government acknowledges that the defendant had no reported violations while under the strict release conditions that included home incarceration at Raleigh House, GPS monitoring, and no internet or internet-capable devices. These conditions are needed to ensure his compliance, and a short period of compliance does not justify the defendant's release home to his mother on lesser conditions with significant limitations on enforcing those conditions. The conditions upon which the defendant is expected to soon be released fail to assure the safety of the community or the defendant's appearance.

---

[8] "Jihad" can mean a struggle or fight against the enemies of Islam, or the spiritual struggles with oneself against sin. Jihad is an obligation incumbent on all Muslims to follow and realize God's will, lead a virtuous life and extend the Islamic community through preaching, education, example, etc.

[9] "Bayah" means a pledge of allegiance to the Islamic State, or ISIS.

The defendant lived with his mother at the time of his arrest, and had lived with her at various times during the relevant period while he was planning to join ISIS. She was unable to appropriately supervise him at that time. In 2022, the defendant's mother reported to law enforcement that she had a rifle and handgun secured in a safe in their home and that the defendant had made comments to her about getting access to the safe. Additionally, the government understands that GPS monitoring is not feasible if the defendant were to live with his mother due to the unavailability of cell phone service. Finally, it would be difficult to ensure that the defendant is not using the internet with devices possessed by his mother. In light of the defendant's history of threats and as Magistrate Judge Neureiter previously acknowledged, placing the burden of monitoring and enforcement back on the defendant's mother "is just an unfair ask." ECF No. 77-1, at 73. If the defendant is not detained, the safety of the community and risk of flight can only be assured through 24/7 supervision by neutral third parties in a third-party facility with GPS monitoring and an enforceable prohibition on internet access.

Accordingly, the government requests that the Court revoke the anticipated release order.

Dated this 4th day of November, 2025.

PETER MCNEILLY
United States Attorney

By:  *s/ Melissa Hindman*
Melissa Hindman
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California St., Ste. 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax:  303-454-0406
E-mail:  Melissa.Hindman@usdoj.gov
Attorney for Government

JOHN A. EISENBERG

16

Assistant Attorney General for the
National Security Division

By: *s/ Tanya Senanayake*
Tanya Senanayake
D.C. Bar No. 1006218
Trial Attorney
Counterterrorism Section
National Security Division
United States Department of Justice
950 Pennsylvania Ave, NW
Washington, DC 20530
Office: (202) 514-1092
Tanya.Senanayake3@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on this 4th day of November 2025, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system which will send notification of such filing to counsel of record.

By:  *s/ Melissa Hindman*
Melissa Hindman
Assistant U.S. Attorney
U.S. Attorney's Office
1801 California St., Ste. 1600
Denver, CO 80202
Telephone: 303-454-0100
Fax: 303-454-0406
E-mail:   Melissa.Hindman@usdoj.gov
Attorney for Government